Matter of Isaiah D. (Chinelle D.— Renison W.) (2024 NY Slip Op 51026(U))

[*1]

Matter of Isaiah D. (Chinelle D.—Renison W.)

2024 NY Slip Op 51026(U)

Decided on July 2, 2024

Family Court, Kings County

Hettleman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 2, 2024
Family Court, Kings County

In the Matter of Isaiah D. A Child Under Eighteen Years of Age 
 Alleged to Be Neglected by Chinelle D., Renison W., Respondents.

Docket No. NN-XXXXX-23

New York City Administration for Children's Services
330 Jay Street, 12th Fl
Brooklyn, New York 11201
By: Special Assistant Corporation Counsel Christopher G. Vidiksis, Esq.
Brooklyn Defender Services - Family Defense Practice
Attorney for Respondent Chinelle D.
177 Livingston St., 7th Fl
Brooklyn, NY 11201
By: Hannah Sotnick, Esq.
Steven C. Bernstein, Esq.
Attorney for Respondent Renison W.
16 Court Street, Suite 2402
Brooklyn, NY 11201
The Legal Aid Society — Juvenile Rights Division
Attorney for the Child Isaiah D.
111 Livingston St., 8th Fl
Brooklyn, New York 11201
By: Abigail Finkelman, Esq. 

Robert Hettleman, J.

I. INTRODUCTION
For the reasons described in this decision, I find that the Administration for Children's Services ("ACS") has proven by the preponderance of the evidence that the respondent parents, Chinelle D. ("Ms. D.W.")[FN1]
and Renison W. ("Mr. W."), neglected their then-13-year-old son.

 II. PROCEDURAL POSTURE
On April 14, 2023, ACS filed this neglect petition, alleging that (1) on or about April 6, 2023,[FN2]
the parents used excessive corporal punishment on the child Isaiah; (2) more than a week later, after Isaiah had been hospitalized but was ready to be released, the parents refused to pick him up from the hospital or make appropriate plans for his care; and (3) this conduct amounted to derivative neglect of their younger children, Elijah and Malia.
The case was filed before another Judge, and on April 14, 2023, that Judge released Elijah and Malia to the parents with various conditions, but she remanded Isaiah (who was still hospitalized at the time) to the care and custody of ACS. The case was assigned to me in mid-August of 2023. During the pre-trial phase of the case, the parents were very cooperative with ACS and foster care agency supervision with respect to Elijah and Malia, who were doing fine at home. On December 7, 2023, ACS offered the parents an Adjournment in Contemplation of Dismissal ("ACD") for those two children for a period of four months, which the parents accepted. The ACD for those children successfully expired on April 6, 2024, and thus that part of the case was dismissed.
In contrast, Isaiah remained in foster care and has not wanted contact with his parents. Likewise, the parents did not want him back in their care unless they felt he got the help he needed to ensure that there would be no violence in the home.
The trial began on February 2, 2024, and it continued on March 11, March 13, April 5, and May 2. On May 2, all parties rested and gave summations. At trial, ACS called one witness, ACS Child Protective Specialist ("CPS") Ms. Lyn, and introduced into evidence the following:
• ACS's Exhibit ("Pet's") 1-3: pictures of injuries to Isaiah taken on April 12, 2023
• Pet's 4: Selected Medical Records for Isaiah from Brookdale Hospital
Ms. D.W. and Mr. W. each testified, and Ms. D.W. called as a witness Betty C., a therapist who had worked with the family in the Spring of 2023. Ms. D.W. introduced into evidence, as Respondent Mother's ("RM's") A, additional selected portions of Isaiah's medical records from Brookdale Hospital. In addition, all counsel stipulated that (1) Ms. D.W. went to a police precinct on April 5, 2023, at approximately 9:51pm to make a report; and (2) Ms. D.W. filed a police report on December 29, 2022.
The Attorney for the Child ("AFC") supported a finding of neglect but did not introduce any evidence at trial.

III. THE EVIDENCE AT TRIAL
1. CPS Lyn
I found CPS Lyn credible. Her testimony was limited in its scope and not disputed in any significant way. She was detailed and corroborated by the records and other evidence in the case. Notably, as described below, in response to different questions and types of questions from counsel at different points in her testimony, Ms. Lyn attributed various statements to Isaiah and each of the parents. This did not appear to be the result of Ms. Lyn trying to favor one side or the other, but neither CPS Lyn nor counsel attempted to reconcile or integrate these statements into a timeline or narrative. As a result, particularly with respect to statements made by Isaiah and his mother, it is hard to know if each gave internally inconsistent statements to CPS Lyn or if CPS Lyn simply described different pieces of their statements at different times in her testimony.
CPS Lyn was assigned to investigate the case, and on April 12, 2023, she spoke to Isaiah at Brookdale Hospital. On direct examination, she testified that Isaiah told her the following: on April 5, 2023, he came home later than his curfew, and he and his mother started arguing. The argument became physical, and Ms. D.W. dragged Isaiah off his bed. Mr. W. intervened and began punching and kicking Isaiah, and then Isaiah fled to the living room. Next, his mother pinned him to the ground, his father choked him while he was on the floor, and at some point, Ms. D.W. threw a scooter at the child, hitting his leg. Isaiah also stated that at some point during the incident, Ms. D.W. called her own mother on the phone.
In response to questioning by other counsel, CPS Lyn provided additional details described by Isaiah. Isaiah stated that he broke his curfew because he was at a park making TikTok videos. When he got home, his mother asked where he was and lectured him about the world being dangerous. Isaiah told his mother to "shut the fuck up," and his father asked why he was speaking to his mother that way. Isaiah then said that he punched at his father, and at some point, he pulled his mother's braids and told her she would lose her job for beating him up. Ultimately, his mother called 911, and he was taken to the hospital.
CPS Lyn observed injuries to Isaiah, and she took the pictures that are Pet's 1-3. These pictures show a small mark to Isaiah's shin and scrapes to his forearm. Isaiah attributed these injuries to the April 5 incident, including that the mark to his leg was from being hit by the [*2]scooter.
CPS Lyn then testified that Isaiah went on to describe that the dynamic in the home had been deteriorating since he identified himself as gay. He said that his parents do not support that type of lifestyle: they had locked him out of the home in the past, and Ms. D.W. brought a "spiritual woman" to come to their home to perform a "ritual" that involved blowing smoke in Isaiah's face, throwing eggs, and cursing at him. Isaiah said that he wished his parents would not be so strict with his curfew, and he had spoken to them about it. In fact, they had moved his curfew back — to 5:00pm — but Isaiah still wanted it to be later.
On April 13, 2023, CPS Lyn spoke with both parents. On direct examination, CPS Lyn testified that Ms. D.W. described that Isaiah was regularly breaking his curfew, and she confirmed that an altercation happened between them on April 5, resulting in Isaiah being hospitalized. She said she called her mother in Guyana during that incident. Ms. D.W. complained that Isaiah's current school is "selecting boys" to be in a gay cult. She acknowledged that the hospital advised the parents that Isaiah was ready to leave the hospital, but she refused to take him home because she felt he needed more time in the hospital.
On questioning by other counsel, CPS Lyn testified to additional statements made by Ms. D.W. The mother said that Isaiah had come home after curfew, and she asked him where he was. Then he cursed at her and pulled her braids, whereupon Mr. W. intervened. Then Isaiah got a push pin or thumb tack and tried to scratch Mr. W. Mr. W. then "contained" Isaiah in the living room while Ms. D.W. called the police. She said that Isaiah's injuries were from him butting himself against a wall and hitting himself with the scooter. At some point, she called her mother in Guyana to show her what was happening. She denied ever using corporal punishment on her children, describing that she was a mandated reporter of child abuse through her work and would not want to jeopardize her job. Ms. D.W. said that their family does not believe in homosexuality and that she believed "demonic spirits" were taking over her son. She said that she was not ready to have Isaiah come home from the hospital, even though he had been hospitalized for over a week and was deemed safe and ready for discharge. She claimed that she was working on finding a different school or residential treatment program for him.
CPS Lyn testified that Mr. W. also confirmed that the incident took place after Isaiah broke curfew, and he said that Isaiah started it. Mr. W. echoed Ms. D.W.'s statements about Isaiah being in a gay cult.
Also on April 13, CPS Lyn went to the home and interviewed the younger children, Elijah and Malia. Both children appeared healthy and well, and CPS Lyn observed no injuries to either child. Elijah, who was 10 years old at the time, described that the April 5 argument took place, and that Isaiah was pulling Ms. D.W.'s hair and screaming "do you want to fight?" Mr. W. came into the room and pinned Isaiah down while Ms. D.W. called the police. When EMS came, Isaiah was kicking a wall. Elijah said that his parents do not use corporal punishment; rather, they take away the children's tablets or television time. Elijah said he likes his family but does not like it when Isaiah misbehaves and causes problems.
Malia, nine years old at the time, said she was asleep but awoke to noise in the home. When she came out of her room, she saw Isaiah on the floor trying to grab their mother's hair. An ambulance came and took Isaiah away, and Malia was mad at Isaiah for fighting with their mother. She, too, denied any corporal punishment in the home, and she felt safe with her parents.
2. Petitioner's 4 and RM's A: Brookdale Hospital Records
The records describe that Isaiah was brought to the hospital by EMS on April 5, 2023. He had dried blood on his face, and he was calm. In RM's A, a medical note from April 5, Isaiah described that he had a history of mental health issues. "The patient described" hitting his head and having scratches on him, he said he would kill his whole family, and he made suicidal statements as well. The record notes that Isaiah had been seen in the emergency room "several times" for similar issues. In that note, Ms. D.W. said that Isaiah struck her multiple times with closed fists and that Mr. W. restrained him. The parents said that the incident started with the child acting out, banging his head on a wall, using a pin to prick himself, and threatening to shoot them. They described a prior incident where Isaiah grabbed a knife and threatened them, and they said they had difficulty handling his behavior. At some point, the hospital held a "family meeting," and Ms. D.W. said they were overwhelmed by Isaiah's behavior and threats. She said she had reached out the Board of Education for help but that they did not take her seriously. 
In different notes from April 6, the hospital described various statements by Isaiah. In one note, Isaiah said he came home late, his parents questioned him about it, the argument escalated, and his parents and his siblings started to beat him up. In another note, the hospital documented injuries to his forehead and cheeks, and Isaiah said his mother hit him with a phone, that the argument escalated, he hit his father with a calendar, and a fight ensued. Isaiah told them that he threatened to slap his mother. In a note from April 8, Isaiah said he was doing okay and wanted to go home. He reiterated that the incident began with an argument about his curfew, and he said he got upset because his mother was hitting him. He hit her back and called her names, and he said that she called him a gay slur during the fight.
The notes document that Isaiah has a history of adjustment disorder, disturbance of conduct, and ADHD. Isaiah said that prescribed medication had helped him in the past, but he stopped taking it in January because of issues with the family's insurance coverage. He said that therapy helps, including family therapy, but that it was not resulting in changes in the family's relationships. He acknowledged that there is less conflict in the family when he follows his curfew and takes his medication. He said he was suspended from school in March for fighting. Isaiah said that his family wants him not to be gay, and his mother performed a ritual on him with candles, coconuts, eggs, coffee, and other items. He said he wants to be with his family, but he wants them to ask better questions, support him, and think more about how to do so. Finally, he agreed to change his own behavior to reduce conflict in the home.
On April 6, Ms. D.W. told hospital staff that Isaiah's behavior had been deteriorating since September of 2022. She said he stole a laptop, lied to family, has outbursts, threatened to get a gun and kill everyone, bangs his head against the wall, scratches his face with a pen, and [*3]has been threatening towards his parents with knives. She acknowledged that his medication had been effective and helped the situation, but she had insurance issues which resulted in Isaiah not being able to stay on the medication. On April 12, the hospital informed Ms. D.W. that Isaiah had made progress and was ready for discharge, but she said she wanted him to be in a residential treatment facility. She said that, among other things, she was concerned about the safety of her other children. On April 13, she again refused to take him home.
3. Betty C.
Overall, Ms. C.'s testimony was not disputed in any meaningful way. However, her testimony also changed a bit from direct to cross, and she did appear to be supportive of the parents.
Ms. C. is a family therapist at the Arab-American Family Support Center ("AAFSC"). Her agency was assigned to provide preventive services to this family, and she worked with them from around March/April to June/July of 2023. Before Isaiah was placed into foster care — on April 14, 2023 — she said she provided family therapy three times per month. She said she had no concerns about Isaiah's behavior; he was calm, and she discussed his lack of communication skills and being unable to verbalize things in a healthy manner. She said that she is trained in cultural competency, and she testified that the family is Caribbean, but that Isaiah is American. She counseled the parents that Isaiah took his parents' responses to heart, and she wanted to help them find the right "emotional balance" to adapt to "American standards." She said that Caribbean women can "become very aggressive," in a style that is very different from Americans. She recommended that the parents learn how to speak in a healthy manner without hurting others' emotions, as well as when to walk away if things become unbalanced and calming down before they say something they will regret. In response, the parents agreed to work on this because the situation with Isaiah was hard for them and they wanted to improve the family's relationship. Likewise, Isaiah said he works on this with his school guidance counselor and social worker.
Ms. C. testified that Ms. D.W. expressed concerns about the gay cult at the school. The mother worried about Isaiah's safety because "a lot of things happen" in the gay community, and she feared that he might be assaulted, get into fights, or get hurt because of his sexuality. Ms. C. tried to work with the parents about this issue, educating them about different culture and sexualities. She described that she had never seen marks or bruises on the child.
At one point in her testimony, Ms. C. described that "the family" never missed a session, and she implied that these sessions and conversations were with everyone present. On cross, she acknowledged that she never met with the entire family together and that Isaiah was never present for these sessions. Rather, she met Isaiah individually at his school on two or three occasions, and she also saw him at the ACS Children's Center after the parents refused to take him home from the hospital. She always described his demeanor to be "calm."
Ms. C. testified that when Isaiah was in the hospital, she collaborated with a hospital social worker on appropriate services for the child. Further, she described that Ms. D.W. was [*4]involved in these efforts. Finally, Ms. C. confirmed that Ms. D.W. refused to bring Isaiah home from the hospital, expressing fear that there would be safety issues.
4. Ms. D.W.
I found Ms. D.W.'s testimony to be credible in parts but not credible in others. She presented as an accomplished and intelligent woman who plainly cares about her children and her family. She was detailed in describing some of the issues and struggles involving Isaiah, and she was corroborated about some of the parents' efforts to deal with his behavior. At other times, Ms. D.W. was vague and evasive, not answering questions directly and frequently changing the subject. Almost every time she was asked about the April 5 incident — in the records, to CPS Lyn, and in court — she gave a different version of events and a changing timeline, and she repeatedly added new allegations as her testimony progressed. She expressed considerable hostility towards Isaiah, taking multiple opportunities to reiterate how out-of-control and bad he is, while praising her own efforts and constantly restating that her career is a top priority in her life, perhaps even over the wellbeing of Isaiah. And she greatly minimized the central role of Isaiah's sexuality in this entire situation. In addition, much of her testimony was not corroborated by the other evidence in the case.
In her first in-court narrative about the incident on April 5, Ms. D.W. described that Isaiah came home at 8:00pm. When she asked him where he was, she said he responded, "Bitch, I am home now." She said that he gave an explanation that she did not believe, and then when she turned, Isaiah grabbed her by her braids. Mr. W. then came to where they were, and Isaiah yelled, "I will destroy this bitch." She told Isaiah not to call her that and to show respect, and then she turned to go to the bathroom. At that point, she said Isaiah grabbed her and tried to hold her down. Then Isaiah ran to the bedroom and started to cut himself with a pushpin, stating to her that a friend told him to do this so that Ms. D.W. would lose her job. She testified that Isaiah started throwing things around the house, and then they called the police. As noted earlier, all counsel stipulated that at some point that evening, Ms. D.W. went into a police precinct and made a report.
When shown the pictures in Pet's 1-3, she said she first saw these injuries when the hospital brought them to her attention. She then said that during the incident, Isaiah had broken glass, picture frames, and other things around the home, and then he took some glass and started cutting up his own leg. As for the injuries to his arm, she said that Isaiah had "marked" his arm with glass well before the April 5 incident.
When asked on direct about the scooter, she said that the scooter was "right there" but denied hitting him with it. She then added, curiously, that it would have been "too heavy" and "time-consuming" to hit the child with it, and that Isaiah was on the floor for a period of time "doing stuff that wasn't making sense." She then volunteered that she was a teacher, and that Isaiah did not want her to graduate with her Master's Degree. She said that Isaiah threatened to call her college to make sure she did not graduate.
Still on direct, Ms. D.W. described a prior incident where, after Mr. W. had left for work, [*5]Isaiah threatened to kill her, Elijah, and Malia, including killing her in her sleep. No additional information was provided about this allegation. She described how in December of 2022, Isaiah was hospitalized due to behavioral problems, including coming home at 10:00pm or later and breaking things in the home. She said they called the police, and all stipulated that she filed a police report on December 29, 2022. After that approximately two-week hospitalization, Ms. D.W. said that the mother of a friend of Isaiah called ACS on her, and that is when AAFSC got involved to provide preventive services and family therapy. She testified that she enrolled Isaiah in therapy and that he went for a while. She described that she reached out to his school due his suspensions, and she said the school advised her to take him out of "the environment."
When asked about how they disciplined Isaiah, Ms. D.W. said that in the past, they would take away his games or phone, reinstate his curfew, and talk with him about the dangers of the streets. When asked specifically whether they used corporal punishment on him, she denied it and reiterated that she is a teacher and a mandated reporter and that she would never destroy her own career.
She next testified that Isaiah never said anything to the parents about his sexuality. Rather, she saw something in his text messages where friends were talking about "religion" and saying that "only gays" go on cruises with their families. She admitted regularly using an anti-gay slur — "anti-man" — but said it was never directed towards Isaiah. She said that in the U.S., people say "gay," but in her culture, they use "anti-man." She claims she did not use it in a derogatory way and that Isaiah never told her that he perceived that term negatively. In addition, at this point in her direct exam, she declared that before Isaiah was removed from their care, she never had any concerns at all about his sexuality and she never discussed with him what she saw on his phone. Yet in other testimony — as well as in the hospital records and other evidence at trial — she said that she had numerous conversations with school staff about how the school tells children how to get involved with "gay and lesbian thoughts" and the children creating a cult about being gay and lesbian. When asked about her comment that "demonic spirits" took over Isaiah, she said she was referring to thinking that Isaiah was on drugs, breaking things in the home, and behaving in other ways that were not like him.
She also described that in late December of 2022 and early 2023, she spoke to Isaiah about his suspensions for fighting, counseling him that he could have hurt someone and could have been arrested, and she asked why he was doing this and why he was "putting me through this." She testified that Isaiah said that he did not like living in the projects, that his mother was too strict, and that he wanted food other than Guyanese food.
In response to questioning from Mr. W.'s attorney, Ms. D.W. stated that during the April 5 incident, the younger children were trying to pull Isaiah off of her. She then said that Isaiah was breaking things at the beginning of the incident, causing Mr. W. to wake up, and that at that point Isaiah was holding a hammer and "aiming" it at her. Then Isaiah was "cuffing," fighting, and trying to cut Mr. W. with broken glass. Upon more pointed questioning, she said that Isaiah brandished a knife during the incident — holding it, "flicking" it, and saying he would kill her and his siblings. She said he had also done this in December of 2022.
In response to questioning from ACS' attorney, Ms. D.W. said that Isaiah began the physical part of the April 5 incident by grabbing her hair and punching her in the face. Mr. W. then came into the room, and that is when Isaiah started breaking a vase and items in the kitchen, as well as "anything he could put his hands on," and this lasted for approximately 30 minutes before she called the police. She testified that at various points during the incident, Mr. W. wrestled Isaiah to the ground, but Isaiah tried again to attack her and started breaking things again. That is when Isaiah went to pick up a knife, but Mr. W. took him to the ground. Then, she added that at some point, Isaiah got loose from Mr. W. and went into a bedroom, and that is when Isaiah marked his own skin with the pushpin "until you see blood" and made the comments about making her lose her job.
When asked if anyone hit Isaiah in the face, she denied doing so intentionally but said that "so much was going on" that maybe she did. When asked about what she meant on direct exam about the scooter being "too time consuming," she said that it is very heavy, picking it up would make "no sense," that she puts her "career ahead of me," and if she had picked up the scooter, the "child would not be alive today." When asked about Isaiah having weapons on April 5, Ms. D.W. described a knife but not a hammer (or any other weapons). When asked about using the term "anti-man," she said she used it frequently, including described people on social media and television who are gay, but she never used that term about Isaiah in his presence. She denied performing any rituals in her home, saying she "grew up Christian," but then she rambled about how this case had been going on for a year and that if she had "intermingled" with voodoo, "we would not be here."
In response to questions by the AFC, Ms. D.W. stated that she delivered a "healthy baby boy" — this is not "a belief . . . he is a boy." She acknowledged that she does not believe in homosexuality, since the bible says that "God created male and female," and she does not want her children to follow that path. She said that if she thought he was "taking on traits," she would ask an elder or pastor to communicate with Isaiah, and then she stated that she did do this before April 5, 2023. Then, not directly in response to any question, Ms. D.W. said that she puts her "career first," that it is very important to her, and that she was worried that this case would impact her career. She said that others are jealous of her because she is an immigrant who has had success, whereas others — seeming to refer to the families of Isaiah's friends — are on public assistance, scream and curse at "us," and "do not know us." She described that she repeatedly told Isaiah that an ACS case would have ramifications for her career. When asked if she felt any remorse, she said she would not feel remorse for "correcting" her son, putting him on the right path, and being a caring mother.
5. Mr. W.
I found Mr. W. credible in part and less credible in others. His testimony was far shorter and less detailed than that of Ms. D.W. He offered very little information other than describing the April 5 incident, and he was asked very little about his role in Isaiah's life. He was clear and concise and answered questions directly, and he did not try to evade or over-explain in his responses. However, his description of the incident changed in response to different questions, and some of his testimony was at odds with the other evidence in the case.
On direct examination, Mr. W. said that he was in bed and heard a commotion. He got up and came to the dining room, where he saw Ms. D.W. ask Isaiah why he was out so late. Isaiah responded, "shut the fuck up, bitch," and Mr. W. asked him why he was speaking that way to his mother. Mr. W. reminded Isaiah that he is supposed to be home on time, and Isaiah responded, "why don't you shut the fuck up." Then he testified that he and Isaiah had a conversation about the child being disrespectful, and then Isaiah started to mark his own skin with a pushpin. Mr. W. tried to pull and carry the child to the dining room, and during this struggle, Isaiah punched Mr. W. in the forehead, and the punch "connected." He then described Isaiah getting a hammer and starting to break things in the home, including the tables, a vase, and other things. Mr. W. took the hammer away from Isaiah and held him down. Isaiah was able to get up, and he attacked his mother by pulling her hair, "cuffing" and punching her. This went on "for an hour or so," and then Mr. W. got Isaiah back on the ground and waited for the police to come. He denied ever choking Isaiah, that the other children got involved, or that anything happened with the scooter.
On cross examination by ACS' attorney, Mr. W. said that he did not see any injuries to Isaiah and that Isaiah was wearing long pants and a long-sleeve hoodie the entire time. Mr. W. described that when he first awoke and came out of his room, nothing was broken yet. He said that after he started pulling Isaiah from the bedroom, Isaiah had the pushpin in his hand, and Mr. W. took it from him. At some point after the incident, but not in the four-hour period immediately afterwards, the family cleaned up the house. Mr. W. did not observe anything broken other than a glass table. He testified that he had an injury to his forehead where Isaiah had punched him and that he took a photograph of that injury. However, he could not produce the photograph for trial because he had changed phones and was "not sure" if the picture was still on his phone.
On questioning by the AFC, Mr. W. said that Isaiah had gone to the kitchen at some point during the incident to get the hammer.

IV. LEGAL DISCUSSION AND ANALYSIS
1. Causes of Action and Constructive Amendment of the Petition
The specific allegations in the petition were (1) excessive corporal punishment of Isaiah on April 5, 2023; (2) refusing to pick up the child from the hospital after the incident; and (3) derivative neglect of the other children. As noted above, the action for derivative neglect was resolved with ACDs for the children Elijah and Malia. In addition, over the course of the trial, the evidence reflected issues about the parents failing to emotionally support Isaiah, particularly with respect to his sexual orientation. On several occasions during the trial, I clarified with all counsel as to what the causes of action were, and ACS and the AFC stated that they sought a finding for emotional neglect. On April 5, 2024, towards the end of the trial, I again clarified the causes of action with all counsel, including seeking case law submissions or legal briefs about all three issues: (1) excessive corporal punishment; (2) refusing to take the child home; and (3) emotional neglect relating to Isaiah's sexual orientation.
Under FCA §1051(b), "the court may amend the allegations to conform to the proof; provided, however, that in such case the respondent shall be given reasonable time to prepare to [*6]answer the amended allegations." In this case, the issue of emotional neglect was raised early on and addressed by all counsel in their preparation, questioning, and factual and legal arguments, and counsel for the parents raised no objection. Accordingly, I will consider that cause of action in this decision.
2. Excessive Corporal Punishment
Parents have a right to use physical force with their children to maintain discipline or to promote the children's welfare. See Matter of Elisa V. (Hung V.), 159 AD3d 827, 828 (2nd Dept. 2018); Matter of Paul M. (Tina H.), 146 AD3d 961 (2nd Dept. 2017). However, the amount of force must be reasonable, and excessive corporal punishment can be the basis for a finding of neglect. Matter of Janiya T. (Johnas M.), 191 AD3d 681, 683 (2nd Dept. 2021) (citing Elisa V.). Whether corporal punishment is excessive is a product of many factors and the totality of circumstances, including the nature of the force used, the age of the child involved, the nature of injuries, and whether or not the conduct was an isolated incident. Id.; Matter of Anastasia L.-D (Ronald D.), 113 AD3d 685 (2nd Dept. 2014); Matter of Michele S. (Yi S.), 157 AD3d 551, 552 (1st Dept. 2018).
Even if the child initiates an encounter, a parent's use of force in response must still be reasonable. Janiya T., 191 AD3d at 681 (mother's actions were unreasonable response to child's provocation); Matter of Rahmel G. (Carlene G.), 201 AD3d 567 (1st Dept. 2022) (discipline was not appropriate in "form or degree," even if valid reason for discipline). A single incident of excessive corporal punishment can suffice for a finding of neglect. Janiya T., 191 AD3d at 681 (citing cases). On the other hand, an isolated incident of inappropriate discipline, particularly where the child is not of a tender age, need not amount to neglect. See, e.g., Matter of Amanda E., 279 AD2d 917 (3rd Dept. 2001) (father slapped child across the face, leaving a black eye, but did not amount to neglect due to child's age [16 years old] and the circumstances surrounding the incident).
In this case, the evidence at trial provides a fractured and incomplete picture of the events that took place on April 5, 2023. Isaiah did not testify at trial. A subject child's out-of-court statements are admissible in a neglect trial, FCA §1046(a)(iv), although they must be corroborated in order to be the basis for a finding of neglect. Id. However, where a child's out-of-court statements are otherwise independently admissible for their truth, they do not require corroboration under the Family Court Act. See Matter of E.H. (M.H.), 209 AD3d 582 (1st Dept. 2022); Matter of Taveon J. (Selina T.), 209 AD3d 417 (1st Dept. 2022). In this case, Isaiah's statements to treatment providers at Brookdale Hospital are germane to his medical treatment — both physical and mental health treatment — and thus they are admissible for their truth. Matter of E.H., 209 AD3d at 583; People v. Ortega, 15 NY3d 610 (2010).
In any event, Isaiah's out-of-court statements to the hospital and to CPS Lyn are sufficiently corroborated by the injuries described in the medical records, the pictures in Pet's 1-3, the hospital's observations of Isaiah's behaviors and diagnoses, the parents' acknowledgment and statements about the incident, and the other children's statements.
As noted above, Isaiah's statements were presented in snippets from various sources. His various descriptions of the incident contained differing accounts and allegations at times — who started it, what items were used, etc. Likewise, the parents' statements in the records are recorded in piecemeal fashion, but even their in-court statements changed repeatedly and substantively over the course of their testimony. The statements made by Elijah and Malia are quite limited in scope, and they do not shed significant light on the incident or the credibility of any of the versions of events. Plainly, the incident occurred over a period of time, involved a scuffle between multiple people, and was an emotionally charged and violent situation. It is understandable that every witness had difficulty in accurately describing the exact sequence of events.
In consideration of all of the evidence in the case, I find Isaiah's statements to be credible. As an initial matter, his documented injuries observed by hospital staff corroborate being physically attacked in the manner he described. He had injuries to his forehead, cheeks, arm and leg. Notably, the pictures in Pet's 1-3 were taken on April 12, approximately a week after the incident, suggesting a significant amount of force being used on multiple parts of his body. In addition, the injuries do not align with the parents' description of what happened — specifically, there are no pin-shaped or pin-sized marks or injuries on his arm, nor are there marks that appear to have been the result of being cut by broken glass.
Moreover, there is no demonstrated, strong-enough motive for Isaiah to fabricate these allegations. Ms. D.W. testified that Isaiah regularly evinced motives to harm or get away from his parents: that he did not want her to graduate from her Master's program, that he wanted to harm her career, that he felt she was too strict, and that he wanted to live somewhere else and have more exposure to different food. But there was no significant evidence to support her assertions. In Isaiah's own statements, he appeared fair, balanced, supportive, and understanding of his parents. He acknowledged that he violated his curfew, cursed at his parents, and participated in the physical fight. Importantly, in one of his statements to the hospital, he stated that he was the one who initiated physical contact on April 5.
During his hospitalization, Isaiah freely admitted to his own prior mental health history, suspensions, and disrespectful behavior. Indeed, he noted that he could and should make a better effort to respect his parents and the family's home, that medication had helped him in the past, and that his parents tried to work with him on his issues. He said that he wished that his parents would handle the entire situation differently, and he said he wanted to return home if his parents would "ask better questions" and support him better. In other words, his statements did not appear those of someone out to frame or demonize his parents, but rather a 13-year-old being open and honest and fairly recalling what happened — the good and the bad.
In contrast, the parents' descriptions of the incident were not consistent or credible. As described earlier, the parents' statements and testimony changed the order of events, differed on what weapons allegedly were used, and gave conflicting versions of each person's actions. Ms. D.W.'s testimony was internally inconsistent, and she was also contradicted in important ways by the narrative of Mr. W. and her own out-of-court statements. Moreover, her in-court [*7]testimony about the scooter was evasive and strange, and both parents' testimony [FN3]
about the scooter was contradicted to Ms. D.W.'s statement to CPS Lyn that Isaiah had hit and injured himself with the scooter. Her testimony about when she was aware of and focused on Isaiah's sexuality was contradicted by other evidence. In contrast to Isaiah's nuanced discussion of his family situation, Ms. D.W. seemed quite intent on painting Isaiah in a negative light, repeatedly describing — sometimes without being asked — Isaiah's violence, threats, and motive to harm her career. In fact, she made clear that protecting her own career was her highest priority.
Notably, neither parent provided any substantive corroboration for their versions of events. While ACS always has the burden of proof in this trial, the parents presented a case and had the opportunity to provide any admissible evidence they chose. They did not provide pictures of any alleged injury to Mr. W., testimony by the grandmother or any other witness, or any pictures or evidence of broken items or damage to the home.
At the same time, the evidence shows that in many ways, Ms. D.W. is an involved and caring mother in her own way. There are no concerns raised whatsoever about the parents' caretaking of Elijah and Malia, and she was credible that she spends time with her family, attempts to promote strong family bonds and morality, and is involved in the children's education and lives. She participated in preventive services and therapy relating to Isaiah, and she went to the hospital when Isaiah was taken there. It is also undisputed that she is the one who called 911 on April 5, 2023. Likewise, the evidence corroborates her testimony that Isaiah's behavior declined towards the end of 2022, as well as that he regularly broke curfew, was suspended from school, and had behavioral flare-ups that resulted in conflict and hospitalization.
Given all of the statements and evidence at trial, it is not clear who started the physical incident on April 5, 2023. However, I find that the parents' actions — both individually and collectively — were inappropriate and excessive. Janiya T., 191 AD3d 681; Rahmel G., 201 AD3d 567. The evidence proves that they did more than merely restrain Isaiah for his own safety. Rather, these two grown adults used significant force on a 13-year-old child that was not justified, contributing to him being injured physically and emotionally. And although there was no evidence of any prior incidents of excessive corporal punishment, the severity of this incident, the child's age, and the child's injuries are significant enough to warrant a finding of neglect.
3. Refusal to Take the Child Home from the Hospital
Case law provides that neglect can be found where parents refuse to take their child home or demonstrate that they want no contact with or responsibility for their child. See, e.g., Matter of Safiyah T. (Tommie D.T.), 133 AD3d 678 (2nd Dept. 2015) (collecting cases). Even where there exists a tumultuous relationship between the family members, this alone does not excuse a parent's refusal to take their children home. See Matter of Jacklynn BB. (Donna CC.), 155 AD3d 1363 (3rd Dept. 2017); Matter of Jalil McC. v. Denise C, 84 AD3d 1089 (2nd Dept. 2011); Matter of Kimberly F. (Maria F.), 146 AD3d 562 (1st Dept. 2017). In Jacklynn BB., the subject child struggled with mental health issues and was alleged to have threatened to kill the respondent mother or herself. However, the Third Department held that this did not excuse the mother's refusal to take the child back into the home. 155 AD3d at 1364 (citing cases). Furthermore, even if parents may have a basis to refuse to take the child back home, they must participate in arranging for appropriate care for the child. Jalil McC., 84 AD3d at 1090; Kimberly F., 146 AD3d at 562 (parent's failure to offer a plan for the child other than foster care).
In this case, the parents do not deny that they refused to take Isaiah home from the hospital when he was cleared for release on or around April 13, 2023, more than a week after the April 5 incident. Ms. D.W. said she refused to do so because she feared for the safety of the younger children. She also stated, both to the hospital and in court, that she wanted or was looking for alternative arrangements for Isaiah, including a residential placement or school of some type for him.
However, she provided no proof or compelling evidence of any such effort or attempt. Again, ACS always retains the burden of proof at trial, but there is no corroboration or support for Ms. D.W.'s self-serving statements that she was making meaningful efforts to locate an alternative plan for Isaiah. The statements she did make were vague and did not even purport to reflect any specific steps the parents had taken. Moreover, the parents' position was not reasonable at the time Isaiah was ready for release from Brookdale Hospital. Isaiah had been admitted to the hospital for over a week, received treatment, returned to a stable and safe baseline, and committed to returning home and working more productively and safely with his family. Isaiah and the parents acknowledged that when Isaiah had been taking his medication and in treatment in the past, the situation was markedly improved. Nevertheless, the evidence shows that the parents were made aware of Isaiah's treatment and progress, as well as that the hospital found him fit to return home. Notably, there is no evidence that the hospital recommended any type of residential placement for Isaiah. Even before April 13, the hospital notified the parents that Isaiah was ready to go home, but the parents refused to take him on multiple occasions and did not offer any meaningful alternative resources or plans.
There is no dispute that Isaiah had ongoing behavioral problems and that parents and child had myriad conflicts. Over time, the parents cooperated with preventive services and family counseling (albeit without Isaiah), sought therapy for Isaiah, and took some steps to improve the situation. However, their testimony and all of the evidence in the case reflect that their efforts were insufficient. Ms. D.W. described having Isaiah speak to a church pastor or elder about her concerns about his lifestyle choices; taking him to see someone at her job; speaking to an unnamed staff member at Isaiah's school — the same staff member who warned and advised Ms. D.W. about the "gay cult" in the school that recruited children — and being told [*8]to take him "out of the environment;" and repeatedly talking to Isaiah and warning him about how his behaviors could be harmful to himself and others. Yet despite his hospitalizations, suspensions, and problems, neither parent described any efforts in substantively working with Isaiah in therapy, school, or the hospital; learning or implementing any strategies; or coming up with any plan for his safety and wellbeing.
Ms. Castellan described some of their work, but the parents did not. Neither parent described adjusting their parenting, reconsidering their communication, or seeking additional comprehensive suggestions or plans for what to do. Indeed, as noted, neither parent offered any concrete evidence of any steps that they took to seek an alternate school, program, or residence for their child. Of course, there is no single route for dealing with a struggling teen, and parents are not required to be mental health experts or to guarantee the success of their own parenting methods. But when their child was ready for discharge from a significant hospitalization, even then Ms. D.W. and Mr. W. did not engage in any meaningful planning or exploration of an alternative. Rather, they simply refused to take him back home. As Ms. D.W. testified, it appears that she "put [her] career first."
D. Emotional Abuse Relating to Isaiah's Sexual Orientation
Emotional and/or verbal abuse can constitute neglect under the Family Court Act, where a respondent's actions place the child at imminent risk of emotional or mental harm. See, e.g., Matter of Kevin M. H. v. Kenneth H., 76 AD3d 1015, 1016 (2nd Dept. 2010); Michele S., 157 AD3d at 552 (citing cases); Matter of Patrice S. v. Karen B., 63 AD3d 620, 620-21 (1st Dept. 2009) (citing cases). In such circumstances, contrary to the arguments of counsel, child welfare cases do not violate a parent's right to free speech under the First Amendment. Rather, the very nature of Article 10 cases involves a balance between a parent's fundamental right to parent their children as they see fit against the state's interest in protecting children from parenting that fails to meet a minimum standard of reasonableness. Nicholson v. Scoppetta, 3 NY3d 357 (2004).
In this case, Isaiah described that his relationship with his parents had deteriorated since he had identified himself as gay. He stated that his parents did not support that kind of lifestyle, that they had locked him out of the home in the past, and that Ms. D.W. had used a "gay slur" towards him during the incident on April 5. He also said his mother had a ritual performed on him involving candles, coconut, eggs, coffee and other items to rid him of being gay.
In court, Ms. D.W. acknowledged that she did "not believe in homosexuality," that the Bible "told her that," and that "god created male and female." When asked whether she ever used a "gay slur," Ms. D.W. responded that she regularly used the term "anti-man." She said this is a common term in her community, that she did not mean to use it in a derogatory way, and that she never used it towards Isaiah. On cross-examination by the AFC, however, she admitted that "the term comes up often," like when they saw things on social media or television, or even in conversations with her own mother. In addition, Ms. D.W. was evasive and inconsistent in her testimony about the role of Isaiah's sexuality in the family dynamic. At one point, she said she had no idea about his sexuality before April 5, 2023, but throughout her testimony she described her ongoing concerns about his school recruiting him into a "gay cult." Upon questioning from [*9]the AFC, she testified that she "was not worried that Isaiah might be gay," but she was worried that the gay cult might turn him into being gay. Then, she said that if she had felt that Isaiah had been taking on any gay "traits," she would have wanted to correct that by talking to him and taking him to a church member. Immediately after saying this, however, she said that she did, in fact, take these actions prior to the April 5 incident. She denied performing any "ritual" on Isaiah, stating that she is a Christian, but then she rambled on about if she had done "powerful" voodoo, she would not be in court and would be back on her job, "doing what I like." Finally on this topic, she said she "knew" where Isaiah was "getting that from," but she did not elaborate.
Parents are free to choose their own values, beliefs, and religious principles, and they are free to raise their children within those parameters, even if it creates tension or unhappiness. But this does not excuse conduct that rises to the level of neglect. See, e.g., Prince v. Massachusetts, 31 U.S. 158 (1944) (child welfare and public safety concerns can outweigh parents' exercise of beliefs); Santosky v. Kramer, 455 U.S. 745 (1982); Matter of Josephine BB. (Rosetta BB.), 114 AD3d 1096 (3rd Dept. 2014) (respondent mother refused to permit child to receive recommended medical care); Matter of Christine M., 157 Misc 2d 4, 14 (Fam. Ct., Kings Co., J. Dabiri, 12/21/1992) (father's religious beliefs regarding required vaccinations did not refute a finding of neglect). In Matter of Ibraheem K. (Jacqueline N.), 190 AD3d 643 (1st Dept. 2021), the First Department upheld a finding of neglect where the parent threatened to send the child to the Middle East due to the child's sexual orientation, with the implication that the child would be killed for that reason. 190 AD3d at 644. In Matter of Shane T., 115 Misc 2d 161 (Fam. Ct., Richmond Co., J. Leddy, 8/12/1982), the trial court found that the respondent father neglected the subject child by regularly calling the child a "fag," "queer," "girl," and similar terms. The Judge rejected the parent's explanation that he was trying to "cure" the child of his "girlie behavior." I have not found any other cases in New York State Family Court specifically addressing a parent's beliefs or actions around sexual orientation. Notably, in Ibraheem K., there were also findings that the parent used excessive corporal punishment on the child, which may have factored into the decision, and the Court in Shane T. noted that the child lived in constant physical fear of the respondent.
Returning to the instant matter, I find that the preponderance of the evidence establishes that Ms. D.W. neglected Isaiah by mocking his lifestyle and failing to support him emotionally. Even if her religious beliefs were honestly held and could be considered acceptable parenting, she continued to use anti-gay slurs regularly, including in the presence of the child, and used one directly to him during the April 5 incident. During this entire time period, Ms. D.W. knew that Isaiah was struggling at school, having behavioral issues at home, and had been hospitalized for mental health problems. Yet she continued to denigrate his sexual orientation, took him to church and coworkers to redirect his thinking, and refused to engage in meaningful and productive ways to understand and work with him. Her proclaimed supportiveness of him, including even if he were gay, is belied by all of the other evidence in the case. And the detrimental harm to Isaiah is clear from his hospitalization, struggles, and statements in April of 2023, particularly in combination with the parents' excessive corporal punishment on him and failure to take him back home or making a sufficient plan for his wellbeing. Cf., Matter of John O. v. Sharon Q., 42 AD3d 687 (3rd Dept. 2007) (no finding of neglect for calling child a vulgar name where it was an isolated incident and no showing that child's emotional condition was [*10]linked to this conduct).
However, there is insufficient evidence to establish any actions or omissions by Mr. W. with respect to Isaiah's sexual orientation, and thus ACS has not proven that cause of action against him.

 5. CONCLUSION
For the reasons described above, ACS has proven by a preponderance of the evidence that Ms. D.W. and Mr. W. neglected the child Isaiah pursuant to FCA §1012 in the following respects: (1) the parents used excessive corporal punishment on Isaiah on April 5, 2023; (2) the parents failed to allow the child to return to the family home after he was cleared for release from the hospital, and the parents failed to provide a meaningful or sufficient alternative plan; and (3) Ms. D.W. emotionally neglected the child by using anti-gay slurs in front of and towards the child, denigrating his lifestyle, and failing to sufficiently support him in the face of her disapproval.
Dated: July 2, 2024
Kings County, New York
ENTER:
Hon. Robert Hettleman
New York State Family Court Judge

Footnotes

Footnote 1:The petition lists her name as W., but in Court, the mother gave her name as D.W. Accordingly, I have used that name in Court and in this decision.

Footnote 2:Although the petition uses the date of April 6, 2023, all of the evidence makes clear that the incident occurred on April 5, 2023.

Footnote 3:Generally, each parent's out-of-court statements are admissible as admissions only against that parent, unless some other hearsay exception applies that would permit such statements for their truth. In this case, CPS Lyn described that she interviewed both parents together, and each parent responded at times to her questions. Likewise, portions of the hospital records appear to reflect conversations held with both parents at the same time. Accordingly, their statements to CPS Lyn, and those made together at the hospital, are admissible against both parents as joint and/or adoptive admissions.